IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MOBIUS MEDICAL SYSTEMS, LP | § | |
| | § | |
| Plaintiff, | § | |
| | § | Case No. 4:13-cv-3182 |
| v. | § | |
| | § | |
| SUN NUCLEAR CORPORATION | § | |
| | § | |
| Defendant. | § | |

Plaintiff Mobius Medical Systems, LP's
<u>Motion for Preliminary Injunction</u>

## Table of Contents

I. Factual Background ...................................................................................................... 2

    A.    Mobius's DoseLab Product is Critical to the Proper Operation of Radiological Treatment and Imaging Machines ..................................................... 2

    B.    SNC Became DoseLab's Exclusive Distributor in 2011 and Agreed Not To Compete and Not To Decompile, Disassemble, or Reverse Engineer ................................................................................................................. 3

    C.    SNC Terminated the Distribution Agreement in March 2013 Despite DoseLab's Commercial Success and the Parties Entered into a Transition Agreement .............................................................................................. 5

    D.    SNC Breached its Covenants and Improperly Used Mobius's Trade Secrets ........................................................................................................................ 7

    E.    SNC's Misconduct Continued and Intensified After it Reverse Engineered DoseLab and Released ImagePro ....................................................... 18

II. Legal Standard ........................................................................................................... 20

III. The Court Should Enjoin SNC's Continuing Improper Use of DoseLab's Trade Secrets ....................................................................................................................... 20

    A.    Mobius Will Succeed on its Claim for Trade Secret Misappropriation ................. 20

    B.    Mobius Faces Irreparable Harm ............................................................................. 26

    C.    The Balance of Hardships Favors Mobius .............................................................. 28

    D.    Enjoining SNC Would Have No Adverse Effect on the Public Interest ................. 29

IV. Conclusion ................................................................................................................. 29

Table of Authorities

**Cases**

*Am. Express Fin. Advisors, Inc. v. Scott*,
  955 F. Supp. 688 (N.D. Tex. 1996) .......................................................................... 28, 29

*Astoria Indus. of Iowa, Inc. v. SNF, Inc.*,
  223 S.W.3d 616 (Tex. App.—Fort Worth 2007, pet. denied) ......................................... 24

*Bohnsack v. Varco, L.P.*,
  668 F.3d 262 (5th Cir. 2012) ....................................................................................... 21

*Center for Economic Justice v. Am. Ins. Ass'n*,
  39 S.W.3d 337 (Tex. App.—Austin 2001, no pet.) ........................................................ 24

*Daniels Health Sciences, L.L.C. v. Vascular Health Sciences, L.L.C.*,
  710 F.3d 579 (5th Cir. 2013) ................................................................................ 21, 22, 26

*Frequent Flyer Depot, Inc. v. American Airlines, Inc.*,
  281 S.W.3d 215 (Tex. App.—Fort Worth 2009, pet. denied) ......................................... 27

*Heil Trailer Int'l Co. v. Kula*,
  2013 WL 5630969 (5th Cir. Oct. 16, 2013)............................................................. passim

*IAC, Ltd. v. Bell Helicopter Textron, Inc.*,
  160 S.W.3d 191 (Tex. App.—Fort Worth 2005, no pet.) .................................... 24, 26, 27

*In re Bass*,
  113 S.W.3d 735 (Tex. 2003)......................................................................................... 22

*Intercontinental Terminals Co., LLC v. Vopak N. Am., Inc.*,
  354 S.W.3d 887 (Tex. App.—Houston [1st Dist.] 2011, no pet.) ................................... 27

*K & G Oil Tool & Service Co. v. G & G Fishing Tool Service*,
  594 S.W.2d 782 (Tex. 1958).......................................................................................... 24

*Mabrey v. Sandstream, Inc.*,
  124 S.W.3d 302 (Tex. App.—Fort Worth 2003, no pet.)................................................ 24

*Metallurgical Indus. Inc. v. Fourtek, Inc.*,
  790 F.2d 1195 (5th Cir. 1986) ...................................................................................... 23

*Sharma v. Vinmar Int'l, Ltd.*,
  231 S.W.3d 405 (Tex. App.—Houston [14th Dist.] 2007, pet. dism'd).................... 22, 27

*Sw. Energy Production Co. v. Berry-Helfand*,
  2013 WL 3461644 (Tex. App.—Tyler July 10, 2013, no pet. hist.)................................ 21

*Sw. Research Institute v. Keraplast Techs., Ltd.*,
    103 S.W.3d 478 (Tex. App.—San Antonio 2003, no pet.) ........................................ 21, 23

*Tex. Med. Providers Performing Abortion Svcs. v. Lakey*,
    667 F.3d 570 (5th Cir. 2012) .......................................................................... 20

*T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*,
    965 S.W.2d 18 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd) .............................. 28

*Wellogix, Inc. v. Accenture, LLP*,
    823 F. Supp. 2d 555 (S.D. Tex. 2011) .................................................... 22, 23, 25

*Wenner v. Tex. Lottery Comm'n*,
    123 F.3d 321 (5th Cir. 1997 .......................................................................... 20

**Statutes**

Tex. Civ. Prac. Rem. Code §134A ...................................................... 21, 22, 24, 25

Mobius Medical Systems, LP (Mobius) respectfully moves this Honorable Court for a preliminary injunction against Sun Nuclear Corporation (SNC) enjoining SNC from its continued improper use and misappropriation of Mobius's valuable trade secrets.

Mobius invested incalculable amounts of time, money and energy into developing DoseLab, an unrivaled software product for use by the radiation oncology community. Mobius's DoseLab provides healthcare institutions and cancer treatment centers with fast, powerful, and accurate means of determining whether the machines they use to treat cancer patients are performing as they should be.

SNC recognized DoseLab's appeal in late 2010 when it sought to be (and became) DoseLab's exclusive distributor. In 2011 and 2012, DoseLab enjoyed greater-than-expected sales and revenue. Despite this success, SNC terminated its distribution agreement with Mobius earlier this year. At the time, SNC gave no reason for its termination, but SNC's motivation became clear in September 2013 when SNC introduced its competing ImagePro product. To create this competing product, SNC misappropriated confidential DoseLab information and trade secrets, in violation of its express covenant not to decompile, disassemble, or reverse engineer Mobius's technology.

On October 11, 2013, Mobius filed suit in the 129th District Court in Harris County, Texas alleging breach of contract, trade secret misappropriation, trade dress infringement, and tortious interference with existing and prospective contracts. (Doc. 1-2). SNC removed the suit to this Court on October 29, 2013. (Doc. 1). SNC, however, has not been chastened by Mobius's claims and continues undeterred its attempts to poach DoseLab's current and prospective licensees with misinformation and misrepresentations about DoseLab and SNC's

knock-off.  Unless enjoined by this Court, SNC's illicit use of Mobius's trade secrets will not stop.

I.

<u>Factual Background</u>

A.   <u>Mobius's DoseLab Product is Critical to the Proper Operation of Radiological Treatment and Imaging Machines</u>

Dr. Nathan Childress, a graduate of M.D. Anderson Cancer Center's esteemed medical physics program, founded Mobius in 2010.  *See* X-1, Affidavit of Nathan Childress, ¶2–3.  Since then, Mobius has endeavored to provide the radiation oncology community with features and functionality not found in previously-available software.   Mobius's most commercially successful product is DoseLab.  *Id*. ¶4.  DoseLab is fast, powerful software used in achieving quality assurance (QA) for radiation oncology linear accelerators used in the treatment and imaging of cancer patients.

The radiation delivered to a patient for treatment purposes should be within 5% of the prescribed dose. *Id*. ¶5.  In order to achieve that level of precision, the characteristics of a linear accelerator must not deviate from known baseline values acquired at the time of acceptance and commissioning.   *Id*. Deviations from the baseline values may result in patients receiving suboptimal treatment. *Id.* QA ensures that the machine administering the radiation is operating properly and that correct dose is being delivered. *Id.*

In August 2009, the American Association of Physicists in Medicine published the 2009 Task Group 142 Report (TG-142 Report) on the QA of Medical Accelerators. *See* X-2.  Since its publication, the TG-142 Report has become the *de facto* standard for medical linear accelerator QA.  X-1 ¶6.  Nearly all healthcare institutions and treatment centers in the U.S. and abroad look to the TG-142 Report guidelines to ensure that their linear accelerators are working properly. *Id*.

DoseLab provides accurate, efficient, and powerful TG-142 QA for any kind of linear accelerator-based technology used in modern radiation oncology *Id*. ¶4.  With its launch, DoseLab introduced several exclusive features to the radiation oncology community.  For example, DoseLab gives users the ability to perform critical imaging tests using multiple "phantoms." *Id*. ¶7.  "Phantoms" are objects made of plastic and metal that typically possess features that allow clinics and treatment centers to test imaging and treatment systems without having to use actual patients.  *Id*.  Since different devices rely on different phantoms for testing, clinics and treatment centers also employ a variety of phantoms.  *Id*.  DoseLab supports the ability to test a wide variety of phantoms from different manufacturers.  This "vendor-neutral" approach means a user can avoid buying multiple phantom-specific software products or relying on a single set of phantoms.  *Id*.

B.    <u>SNC Became DoseLab's Exclusive Distributor in 2011 and Agreed Not To Compete and Not To Decompile, Disassemble, or Reverse Engineer</u>

SNC became the exclusive distributor of DoseLab in the U.S. on March 1, 2011.  X-1 ¶10.  Before then, SNC did not offer a software product that could perform TG-142 QA, like DoseLab. *Id*. ¶9.

Under section 1.3 of the Software Distribution Agreement (Distribution Agreement) between Mobius and SNC, SNC agreed to "[f]aithfully and diligently use its best efforts to promote, advertise, market, offer for sale and sell the Products in the Territories and cooperate with Manufacturer in maximizing sales of the Products in the Territories." *See* X-3.  In exchange, SNC agreed to retain a percentage of DoseLab sales revenue.  *See id.* §4.3; *see also id*. Exhibit D.

Under section 7 of the Distribution Agreement, SNC agreed that it would not sell or promote any products that directly compete with DoseLab:

7. <u>Non-Competition</u>.  Distributor [SNC] covenants and agrees that it (a) will not serve as a distributor, dealer or sales agent of, and not to sell, license, lease or market, any third party products which are Directly Competitive with the Products, at any time during the term of this Agreement and for a period of six (6) months after the expiration or earlier termination; and (b) will not sell any of its own products which are Directly Competitive with the Products at any time during the term of this Agreement and for a period of six (6) months thereafter. For purposes of the foregoing covenant, any and all products whose primary function is film or EPID based image analysis software for radiation oncology linear accelerator QA as defined in AAPM TG-142, and treatment log analysis software whose primary function is per fraction QA, will be deemed to be "Directly Competitive" with the Products.

*Id.*

Under section 9.1 of the Distribution Agreement, SNC acknowledged that Mobius's confidential and proprietary information, includes "customer lists and customer opportunities, market intelligence, pricing, market share, revenue, discount and IP knowledge, and other technical information (including any Functional Design, Technical Design, drawings, analysis, research, processes, computer programs, methods, ideas, "know how" and the like").

Under section 9.2 of the Distribution Agreement, SNC agreed that during the term of the agreement and "all times thereafter," SNC would not use or disclose Mobius's confidential information or attempt to decompile, disassemble or reverse engineer Mobius's products:

9.2. <u>Covenant Not to Use or Disclose</u>. With respect to each party's Confidential Information, and except as expressly authorized herein, ***each party hereby agrees that during the Term hereof and at all times thereafter it shall not use or disclose such Confidential Information to any person or entity***, except to its own employees having a "need to know" (and who are themselves bound by similar nondisclosure restrictions), and to such other recipients as the other party may approve in writing; provided, that all such recipients shall have first executed a confidentiality agreement in a form acceptable to the owner of such information. ***Distributor [SNC] may not***: (i) alter or remove from any Product or associated documentation owned or provided by the Manufacturer [Mobius] any proprietary, copyright, trademark or trade secret legend, or (ii) ***attempt to decompile, disassemble or reverse engineer Manufacturer's Products (and any information derived in violation of such covenant shall automatically be deemed Confidential Information owned exclusively by the Manufacturer)***. Each party shall use at least the same degree of care in safeguarding the other party's

> Confidential Information as it uses in safeguarding its own confidential information.

*Id*. (emphasis added).

Under Section 13.1, either party had a right to terminate the agreement: "by giving one hundred and eighty (180) days written notice of termination to the other party." *Id*. SNC expressly agreed that the non-competition and confidentiality provisions of Sections 7 and 9 "shall survive the expiration or earlier termination of this Agreement *for any reason*." *Id.* §15.3 (emphasis added).

C.     SNC Terminated the Distribution Agreement in March 2013 Despite DoseLab's Commercial Success and the Parties Entered into a Transition Agreement

In April 2011, SNC forecasted that it would sell 31 DoseLab licenses in 2011, 55 licenses in 2012, and 75 licenses in 2013. X-1 ¶11. SNC significantly underestimated sales. Nearly two times as many DoseLab licenses were purchased in 2011 (60 licenses) and over three times as many licenses were purchased in 2012 (185 licenses). *Id*.

In 2011, Mobius employees helped SNC field questions about DoseLab at SNC's booth during the annual American Association of Physicists in Medicine (AAPM) conference. More visitors to SNC's booth inquired about DoseLab than nearly any other product offered by SNC. This prompted SNC's founder and former CEO, William Simon, to say afterwards, "You beat us." *Id*. ¶12.

To Mobius's surprise, on March 8, 2013 SNC CEO Jeff Simon said he wanted to terminate the Distribution Agreement. *Id*. ¶13. Mr. Simon did not provide a specific reason for termination. *Id*. DoseLab sales had exceeded expectations, and the parties' business relationship appeared strong. *Id*. Mobius routinely fielded technical questions from SNC's sales people and participated in SNC-hosted webinars about DoseLab. *Id*. Mobius employees assisted in the development of a group of phantoms to be used along with DoseLab. *Id*. Mobius shared

information about new developments and improvements to DoseLab. *Id.* In Mobius's view, the parties' efforts to promote and sell Mobius's innovative product were going well.

On April 10, 2013, SNC and Mobius entered into a Transition Agreement to govern the termination of SNC's exclusive distributorship. *See* X-4. Under the terms of the Transition Agreement, SNC retained exclusive DoseLab distribution rights in the U.S. until September 8, 2013 and world-wide exclusive DoseLab distribution rights until December 31, 2013. *Id.* §1(a).

The Transition Agreement permitted SNC to begin competing with DoseLab after September 8, 2013. *Id.* §2(a). This reflected a significant concession on Mobius's part. Under the plain language of the Distribution Agreement's non-competition provision, SNC would not have been able to market or sell any competing products until March 8, 2014 (six months after the termination date). *See* X-3 §7.

Importantly, SNC agreed, at Section 3(c) of the Transition Agreement, that it would "not encourage by any means, any DoseLab customer (potential or existing) to delay purchases to 09/08/2013 or thereafter." X-4 § 3(c).

Section 4 of Transition Agreement stated that "the following portions of the [Distribution Agreement] are no longer applicable in their entirety: a) Section 1 Appointment of Distributors; b) Section 7 Non-Competition; c) Section 12 Duration of Agreement, Terms; and d) Section 13 Termination of Agreement." *Id.* §4. The Transition Agreement added "[t]hose portions of the [Distribution Agreement] not specifically referenced in Section 4 immediately above shall govern the relationship of Mobius and SNC under the terms set out above in Sections 1–3 of this Transition Agreement." *Id.* §5.

Meaning, SNC's "Covenant Not to Use or Disclose" confidential information, and SNC's covenant not to "decompile, disassemble or reverse engineer" under Section 9.2 of the Distribution Agreement remained in full force and effect after termination.

D.     SNC Breached its Covenants and Improperly Used Mobius's Trade Secrets

On March 27, 2013, less than three weeks after SNC's abrupt and unexpected notice of termination, SNC employee Sindhu Gangisetty submitted a support request to Mobius at Mobius's www.doselab.com web portal demanding, "I need doselab pro 6.5 version for download. thanks."  X-1 ¶15.  It was not uncommon for SNC employees to contact Mobius about DoseLab, but this request was different.  The web portal is designed for potential customers interested in DoseLab, not for employees of DoseLab's exclusive distributor.  As well, the request did not come from an SNC sales or marketing employee—the SNC employees with whom Mobius typically interacts.  Instead, the sender was an SNC "Software Test Engineer," who according to her LinkedIn.com page, performs testing on features of "a tool for performing QA activities on Linear Accelerators."  *Id.*

After being asked the reason for her request, Ms. Gangisetty explained that she was "interested in the latest features of DoseLab pro 6.5."  *Id.* ¶16.  In response, Dr. Childress reminded her (as well as SNC's CEO Jeff Simon) that SNC could rely on marketing materials to understand features but that DoseLab could not be installed at SNC "for anything other than sales demonstration purposes." *Id.*  SNC's CEO Jeff Simon shrugged off his engineer's behavior as "harmless curiosity."  *Id.*

Worried that SNC was using (or thinking about using) DoseLab as a guide to develop its own competing product—an act that would violate the express terms of the Distribution Agreement—Dr. Childress again emphasized to SNC and its CEO that "DoseLab is not to be used as a demo product for your software teams, nor is it to be used as a tool to guide

development of any Sun Nuclear Products." *Id*. ¶17.  In his reply, SNC CEO Jeff Simon again chalked up Ms. Gangisetty's actions to "curiosity."  *Id*.

Mobius's fears were confirmed on September 10, 2013.  Two days after SNC could "market and sell its own products competitive to those of Mobius" under the Transition Agreement, SNC publicly released its ImagePro software product.  ImagePro is a near identical knock-off of DoseLab.  ImagePro's features, functionality, raw configuration files, and appearance are all derived from DoseLab.

Under section 9.2 of the Distribution Agreement, SNC may not "attempt to decompile, disassemble or reverse engineer Manufacturer's Products (and any information derived in violation of such covenant shall automatically be deemed Confidential Information owned exclusively by the Manufacturer)."  Based on the striking functional, parametric, and visual similarity between DoseLab and ImagePro, it is clear that SNC decompiled, disassembled, or reverse engineered DoseLab in violation of its obligations under the Distribution Agreement and misappropriated DoseLab's never-before-seen algorithms, innovative parameters, and unique visualizations to create its knock-off product.  The similarities between DoseLab and ImagePro, ImagePro's distinct use of DoseLab files in its internal configuration, and ImagePro's marketing materials confirm this.

1.    kV/MV Imaging QA

kV/MV imaging QA is performed to ensure that the treatment machine is capable of aligning patients in the correct position before radiation delivery. X-1 ¶18.  kV/MV imaging itself is often performed on patients before each treatment.  In order to enhance the efficiency and efficacy of this process, DoseLab invented a new algorithm to perform kV/MV imaging quality assurance analysis of multiple types of phantoms.  *Id*.  DoseLab's algorithm and ability to analyze multiple phantoms from multiple manufacturers serves as one of DoseLab's strongest

selling points. *Id*. Indeed, at the time SNC entered the Distribution Agreement with Mobius, DoseLab was the only imaging QA program that could analyze multiple types of phantoms. *Id*.

As part of its exclusive kV/MV imaging algorithm, DoseLab uses reference images to overlay red numbered boxes representing various regions of interest (ROI). X-1 ¶19. No other software uses reference images as an input to its imaging QA algorithm. *Id*. DoseLab also generates very specific results criteria, including scaling discrepancy, minimum uniformity, X positioning offset, and Y positioning offset. *Id*. No other software uses these results criteria. *Id*. The following screenshot is from DoseLab:



SNC's ImagePro copies DoseLab's results verbatim. SNC's ImagePro overlays red numbered boxes with ROIs with the same numbering scheme, same colors, and same positioning as DoseLab. SNC's ImagePro even copies DoseLab's internal configuration parameters, ROI coordinates, and algorithm designed to analyze multiple phantoms from multiple manufacturers. ImagePro's use of DoseLab's ROI coordinates further confirms SNC's unabashed copying. ImagePro's default ROI coordinates are identical to DoseLab's to at least three significant digits. *Id*. DoseLab's interface displays coordinates to only *two* significant digits. *Id*. This indicates

SNC incorporated DoseLab's raw configuration files for direct use in ImagePro. The following image is from ImagePro's marketing brochure (X-5 at 5):



Despite the low resolution of the ImagePro brochure reproduction, SNC's deliberate copying and reverse engineering is evident.

###### 2.    Multi-Leaf Collimator QA

A multi-leaf collimator (MLC) is a device made of thick metal leaves that move to dynamically shape a radiation treatment beam.  X-1 ¶20.  Every leaf is monitored 20-100 times per second.  *Id*.  A recording of the leaf positions is called an MLC Log.  *Id*. MLC QA is essential to all clinics that use MLCs because MLC performance defines how precisely radiation is delivered to a patient.  *Id*.

Mobius designed an innovative graphical leaf representation using red, yellow, and green rectangles and informative mouse-over tooltips to reflect the results of the MLC log.  X-1 ¶21. All DoseLab MLC results, configuration parameters, and methods for visualizing and displaying those results and parameters are found in no other product – except ImagePro.  *Id*. The following is a screenshot of an MLC log from DoseLab:



SNC's ImagePro directly copies DoseLab's graphical leaf representation, uses the same red, yellow, and green display parameters, the same mouse-over tooltip text, and even copies DoseLab's unique display of multiple individual file results ordered in a table.  SNC clearly derived its MLC parameters by reverse engineering DoseLab.  The following is from ImagePro's marketing brochure (X-5 at 4):



3.       MLC Strip Test

Another method of MLC QA is the MLC strip test, which the TG-142 Report recommends be done weekly. X-1 ¶22. During an MLC strip test, an image is taken by aligning the MLC's leaves to form a series of strips. *Id*. The image is analyzed to determine each leaf's deviation from center. *Id*. DoseLab's method of displaying horizontal lines to indicate individual leaf location and vertical lines to indicate the center of best fit on the evaluated image is a method used by no other QA software. *Id*. DoseLab's method of displaying the histogram representing differences of the individual leaves is also unique to DoseLab. *Id*. The following is an MLC strip screenshot from DoseLab:



SNC's ImagePro directly copies DoseLab's MLC strip test and method of displaying individual leaf location. Before ImagePro improperly copied DoseLab's MLC strip test, no other TG-142 QA product displayed results in this manner. The following is an image from ImagePro's marketing material (X-5 at 4):



4.      Cone Beam CT Imaging

Cone beam CT imaging provides a wealth of data regarding the proper alignment of a patient to a treatment beam.  Accurately positioning patients based on their internal anatomy (bones, organs, etc.) is critical to safe and effective treatment.  X-1 ¶23.  Thus, most new treatment machines include integrated CT imaging capabilities.  *Id*.  Like kV/MV imaging, CT imaging QA uses phantoms, but a CT image consists of 5–200 individual images taken of different slices in a phantom. *Id*.

DoseLab employs a distinct method for displaying Cone Beam CT Imaging.  X-1 ¶24. DoseLab uses a distinct numbering scheme, distinct number of ROIs, distinct color-schemes and shapes for identifying certain ROIs, and distinct results parameters that correspond to the scaling discrepancy, minimum uniformity, and geometric distortion. *Id*.  The following is a screenshot of CT imaging results from DoseLab:



SNC's ImagePro directly copies every aspect of DoseLab's CT imaging module. SNC's ImagePro uses the same results parameters, and employs the same exclusive ROI numbering scheme, positioning, and unique shape. SNC's ImagePro even copies the exact look and feel of each display module. ImagePro's indiscriminate level of copying is astonishing (X-5 at 5):





5.   Starshot

A starshot image is taken by delivering a very narrow strip of radiation, rotating a component of the delivery system, and taking a new image.  X-1 ¶25.  The sum of these images creates a starshot pattern.  *Id.*  An exemplary DoseLab starshot is shown below:



The starshot image above is based on a DoseLab-exclusive example image file that ships with DoseLab.  SNC used the same example image file to create a similar starshot image, as shown below (X-5 at 4):



SNC repeatedly uses this starshot image in its promotional materials.  For example, the following images are from one eight-page ImagePro brochure (X-5):





### ImagePro™

#### Built To Perform

Building upon the innovation and quality that you've come to trust and expect from Sun Nuclear, ImagePro was built from the ground up to deliver a comprehensive TG-142 solution that is fast, accurate, and easy to use.

ImagePro software and phantoms address all the common TG-142 tasks. Consistent with Sun Nuclear practice, ImagePro software



#### Startshots

► Test gantry, collimator, and couch rotation with a single click, eliminating the need to manually detect the center.

In other words, not only did SNC misappropriate DoseLab's algorithms and raw configuration files, it misappropriated DoseLab's exemplary images and used them as the cornerstone of ImagePro's marketing.

SNC's blatant misappropriation is evident from the logs of Mobius's webserver as well. Each time SNC engineers access DoseLab, the program transmits a message to Mobius's webserver with the time, license name, and internet protocol address ("IP address") of the computer accessing DoseLab.  X-1 ¶27.  During ImagePro's development, SNC's engineers accessed DoseLab software an unprecedented amount of times.  Between January 2013 and September 2013, Mobius's webserver logged nearly 750 messages from SNC's Brevard County, Florida-based IP address.  *Id.*  For reference, Mobius logged less than ten messages per individual DoseLab trial user during the same period.  *Id.*  For further reference, two Houston-area treatment facilities with four active linear accelerators together sent only 92 messages in the same 9-month period.  *Id.*  This demonstrates that SNC's engineers repeatedly launched

DoseLab, decompiled, disassembled, or otherwise reverse engineered DoseLab's programming, and improperly used DoseLab's features as a guide for ImagePro's development.

DoseLab provides features and functionality absent from other TG-142 QA products. Thus, comparing DoseLab and ImagePro to third-party TG-142 QA products further underscores SNC's brazen copying. For example, to perform monthly TG-142 QA, DoseLab requires a physicist to acquire 15 images. *Id.* ¶28.  The closest competing product, Standard Imaging's "PIPSpro" product, requires acquiring 26 images.  *Id.* PIPSpro likewise requires eight phantoms for monthly QA to DoseLab's five. *Id.* The fewer the scans and phantoms, the better. Unsurprisingly, ImagePro needs exactly 15 images and five phantoms, the same as DoseLab. *Id.*

At its core, SNC's ImagePro is nothing more than a clone of DoseLab created through indiscriminate copying of DoseLab's technology.

E.     SNC's Misconduct Continued and Intensified After it Reverse Engineered DoseLab and Released ImagePro

Even though SNC remains a DoseLab distributor to this day (and through the end of 2013), SNC wrongly informed potential customers that it was no longer a distributor of DoseLab, improperly tried to get customers to purchase ImagePro instead, and purposefully exploited consumer confusion between DoseLab and SNC's cloned knock-off.  For example, on September 17, 2013, a soon-to-be DoseLab licensee called Mobius to inquire about DoseLab. *Id.*  ¶32.  According to the licensee, when he talked to SNC, SNC falsely told him that it no longer distributed DoseLab, and tried to sell ImagePro.  *Id.*

According to another potential licensee, his institution needed DoseLab quickly and had already approved the purchase of DoseLab from SNC.  *Id.* ¶31.  Rather than timely fill this order of DoseLab (or notify Mobius that a consumer attempted to purchase DoseLab), SNC tried to exploit this request to purchase DoseLab by offering to demonstrate ImagePro. *Id.*

On September 25, 2013, Mobius received a call from a DoseLab licensee asking about his DoseLab maintenance renewal. *Id.* ¶35. This licensee purchased a DoseLab license in 2013 with a maintenance package valid until 2015. *Id.* To the licensee's dismay, SNC Service Contract Manager John Archipolo suggested "upgrading" his DoseLab license to ImagePro. *Id.* Mr. Archipolo offered the licensee "a maintenance software upgrade path" even though his DoseLab license would not expire for nearly 18 months. *Id.* Additionally, the licensee was unsure whether DoseLab would continue to be supported at all. *Id.*

On October 1, 2013, SNC regional account manager Stacey Geier contacted a DoseLab licensee awaiting final approval from his institution. X-1 ¶36. According to the licensee, Ms. Geier attempted to get the licensee to cancel his DoseLab purchase in favor of an ImagePro purchase by claiming that DoseLab had some "deficiencies" and suggesting that DoseLab may not be compatible with future SNC products. *Id.*

Mobius sued SNC on October 11, 2013 seeking preliminary and permanent injunctive relief for SNC's alleged breach of the Distribution and Transition Agreements, trade secret misappropriation, trade dress infringement, and tortious interference with existing and prospective contract. (Doc. 1-2). Mobius's Original Petition describes these and other instances of similar behavior, but SNC has not ceased or even mitigated its flagrant misconduct. Mobius has learned that in late October 2013, after SNC had been duly served with this suit, SNC began offering an ImagePro "swap" to licensees with pending DoseLab purchase orders. X-1 ¶39. Mobius seeks a preliminary injunction enjoining SNC from its continued illicit acts.

II.

Legal Standard

The purpose of a preliminary injunction is to preserve the status quo, prevent irreparable harm to the parties, and preserve the court's ability to render a meaningful decision after a trial on the merits.  *Wenner v. Tex. Lottery Comm'n*, 123 F.3d 321, 326 (5th Cir. 1997).

In order to obtain a preliminary injunction, Mobius must demonstrate: (1) a substantial likelihood of success on the merits, (2) irreparable injury, (3) a favorable balance of hardships, and (4) no adverse effect on the public interest.  *Heil Trailer Int'l Co. v. Kula*, 2013 WL 5630969, at *2 (5th Cir. Oct. 16, 2013) (citing *Tex. Med. Providers Performing Abortion Svcs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012)).

III.

The Court Should Enjoin SNC's Continuing Improper Use of DoseLab's Trade Secrets

Mobius seeks to preserve the status quo that existed before SNC wrongly misappropriated its confidential information and trade secrets and used that information to create a knock-off product and interfere with its business relationships.  Accordingly, Mobius requests a temporary injunction (and permanent injunction upon final hearing) enjoining SNC from:

> (1) "promoting, marketing, advertising, selling, and offering for sale SNC's ImagePro software product or software modules therein" and

> (2) "promoting, marketing, selling, and offering for sale any software products or modules derived through SNC's misappropriation of Mobius's trade secrets, regardless of whether these software products or modules are stand-alone products or incorporated into other products."

Mobius is willing to post the necessary bond and respectfully requests a hearing and expedited consideration of its Motion.

A.     Mobius Will Succeed on its Claim for Trade Secret Misappropriation

"To show a likelihood of success, the plaintiff must present a *prima facie* case, but need not prove that he is entitled to summary judgment." *Daniels Health Sciences, L.L.C. v. Vascular*

*Health Sciences, L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013).  Here, Mobius has presented a *prima facie* case on its claims for breach of contract, trade secret misappropriation, trade dress infringement, and tortious interference.  For purposes of this Motion for Preliminary Injunction, however, Mobius focuses its request on its claim for trade secret misappropriation.

Mobius's claim for trade secret misappropriation stems from SNC's disassembling, decompiling, or reverse engineering DoseLab's algorithms, visualization techniques, configurations and parameters, and other DoseLab-exclusive technology in violation of SNC's express covenant.  Under Texas law, "[t]he improper use of trade secrets provides a proper basis for an injunction."  *Sw. Research Institute v. Keraplast Techs., Ltd*., 103 S.W.3d 478, 482 (Tex. App.—San Antonio 2003, no pet.); *see also* Tex. Civ. Prac. Rem. Code §134A.003 ("Actual or threatened misappropriation may be enjoined.").

To recover on a claim for trade secret misappropriation under Texas law, a plaintiff must show: (1) the existence of a trade secret, (2) that the trade secret was obtained through breach of a confidential relationship or discovered by improper means, (3) use of the trade secret without authorization, and (4) injury.  *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 279 (5th Cir. 2012); *Sw. Energy Production Co. v. Berry-Helfand*, 2013 WL 3461644, at *13 (Tex. App.—Tyler July 10, 2013, no pet. hist.).

1.    DoseLab's Algorithms and Technology Constitute a Trade Secret

In this case, it cannot be legitimately disputed that DoseLab's algorithms, visualization techniques, example files, configurations and parameters, and other DoseLab-exclusive technology constitute trade secrets.  "A trade secret is any formula, pattern, device, or compilation which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it."  *Sharma v. Vinmar Int'l, Ltd.*, 231 S.W.3d 405, 424

(Tex. App.—Houston [14th Dist.] 2007, pet. dism'd); *see also* Tex. Civ. Prac. Rem. Code §134A.002(6) (defining "trade secret").

The Texas Supreme Court has enumerated six factors to examine in determining whether information constitutes a trade secret in this State: (1) the extent to which the information is known outside the claimant's business; (2) the extent to which the information is known by employees and others involved in the claimant's business; (3) the extent of the measures taken by the claimant to guard the secrecy of the information; (4) the value of the information to the claimant and to its competitors; (5) the amount of effort or money expended by the claimant in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.   *See In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003).  A party claiming a trade secret need not satisfy all six factors because trade secrets do not fit neatly into each factor each time.  *Id.*; *see also Heil Trailer*, 2013 WL 5630969, at *3 ("From the text of the order, it therefore appears that the district court 'required' Heil 'to satisfy all six factors,' which is explicitly forbidden by *In re Bass*.").

In this case, DoseLab's algorithms, visualization techniques, example files, configurations and parameters for its kV/MV imaging functionality, MLC log functionality, MLC strip test functionality, cone beam CT functionality, flatness and symmetry functionality, and Starshot imaging qualify as trade secrets under the *In re Bass* factors:

- **First Factor**: Mobius's algorithms and exclusive functionality are not known outside its business.  As discussed above, Mobius employs unique algorithms in performing kV/MV and CT imaging analysis and DoseLab's MLC log and MLC strip test configurations and techniques are exclusive to DoseLab.  TG-142 QA is well-known in the industry, to be sure, however, no other software includes the same TG-142 QA algorithms as DoseLab. *See Wellogix, Inc. v. Accenture, LLP*, 823 F. Supp. 2d 555, 562–563 (S.D. Tex. 2011) (confirming jury's verdict under Texas law when "the jury was presented with documentary evidence indicating that, though the functions of Wellogix's software were known to the industry, other software companies did not have identical functions in their software."); *see also Daniels Health*, 710 F3d at 583 ("Although information that is

generally known in an industry cannot be a trade secret, this court has specifically rejected the contention that a combination of disclosed technologies cannot itself constitute a trade secret.").

- **Second and Third Factors**: A very limited number of Mobius employees know its confidential information, and Mobius has taken measures to guard the secrecy of its information. For example, access to the DoseLab source code is heavily restricted and those few employees with access are subject to confidentiality obligations. X-1 ¶40. All employees have a duty to maintain the confidentiality of DoseLab's most inner workings. *Id*. Additionally, Mobius does not freely provide DoseLab for download, and even demonstration licenses require potential licensees to obtain log-in credentials and a trial license that likewise limits use and protects confidentiality. *Id*. Even after receiving the software, a user must accept an end-user license agreement, which precludes improper use, such as reverse engineering.[1] *Id*.

- **Fourth Factor**: Mobius's algorithms and exclusive functionality have immeasurable value to Mobius. As a company, Mobius is still in its infancy, and DoseLab along with two other products make up its entire product line. By contrast, SNC is a much larger company that sells dozens of products. Thus, Mobius's algorithms and exclusive functionality are certainly more valuable to Mobius than they are to SNC.

- **Fifth Factor:** Mobius's founder, Dr. Nathan Childress, and his development team dedicated years to perfecting and refining DoseLab's algorithms and features in order to make it a successful commercial product. X-1 ¶41. Dr. Childress and his team recognized the shortcomings of other TG-142 QA products and created innovative ways of resolving those shortcomings and more. DoseLab's significantly-better-than-expected sales are proof of DoseLab's superiority. "When money and time are invested in the development of a procedure or device which is based on an idea which is not new to a particular industry, and when that certain procedure or device is not generally known, trade secret protection will exist." *Keraplast*, 103 S.W.3d at 483.

- **Sixth Factor**: Mobius's information could not easily be properly acquired or duplicated by others. In addition to the protections described above, Mobius's algorithms and similar information require high degrees of training in both medical physics and computer programming to properly understand. Moreover, "the fact that a trade secret is of such a nature that it can be discovered by experimentation or other fair and lawful means does

---

[1]Even if DoseLab did not have these safeguards in place, courts have held that requisite secrecy is retained if "the disclosure occurs in a context that would not ordinarily occasion public exposure, and in a manner that does not carelessly exceed the imperatives of a beneficial transaction." *Wellogix*, 823 F. Supp. 2d at 564; *see also Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1200 (5th Cir. 1986) (finding no surrender of secrecy where disclosures were not public announcements and secrets divulged only to businesses with whom plaintiff dealt with expectation of profit). None of Mobius's disclosures "carelessly exceed the imperatives of a beneficial transaction."

not deprive its owner of the right to protection from those who would secure possession of it by unfair means." *Heil Trailer*, 2013 WL 5630969, at *4.

As well, at the preliminary stage of deciding whether to grant a temporary injunction, a trial court does not determine whether or not a trade secret actually exists. *Center for Economic Justice v. Am. Ins. Ass'n*, 39 S.W.3d 337, 343 (Tex. App.—Austin 2001, no pet.). "Rather, the trial court ascertains whether the applicant has established that the information is entitled to trade-secret protection until the trial on the merits." *Id.*; *see also Mabrey v. Sandstream, Inc.*, 124 S.W.3d 302, 311 (Tex. App.—Fort Worth 2003, no pet.). In this case, Mobius has established *at the very least* that its algorithms and exclusive functionality are entitled to trade-secret protection until the trial on the merits.

2. <u>SNC Improperly Obtained Mobius's Trade Secrets</u>

SNC improperly acquired Mobius's trade secrets. "Improper means of acquiring another's trade secrets include theft, fraud, unauthorized interception of communications, inducement of or knowing participation in a breach of confidence, and other means either wrongful in themselves or wrongful under the circumstances of the case." *Astoria Indus. of Iowa, Inc. v. SNF, Inc.*, 223 S.W.3d 616, 636 (Tex. App.—Fort Worth 2007, pet. denied); *see also* Tex. Civ. Prac. Rem. Code § 134A.002(3) (defining "misappropriation"). The existence of a confidentiality agreement between two parties can establish that a confidential relationship existed between the parties. *IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 199 (Tex. App.—Fort Worth 2005, no pet.); *see also K & G Oil Tool & Service Co. v. G & G Fishing Tool Service*, 594 S.W.2d 782, 787 (Tex. 1958) ("The basis of the trade secret case is a 'breach of contract or wrongful disregard of confidential relationships.'").

Section 9.2 of the Distribution Agreement states:

9.2. <u>Covenant Not to Use or Disclose</u>. With respect to each party's Confidential Information, and except as expressly authorized herein, ***each party hereby agrees***

*that during the Term hereof and at all times thereafter it shall not use or disclose such Confidential Information to any person or entity*, except to its own employees having a "need to know" (and who are themselves bound by similar nondisclosure restrictions), and to such other recipients as the other party may approve in writing; provided, that all such recipients shall have first executed a confidentiality agreement in a form acceptable to the owner of such information. *Distributor [SNC] may not*: (i) alter or remove from any Product or associated documentation owned or provided by the Manufacturer [Mobius] any proprietary, copyright, trademark or trade secret legend, or (ii) *attempt to decompile, disassemble or reverse engineer Manufacturer's Products (and any information derived in violation of such covenant shall automatically be deemed Confidential Information owned exclusively by the Manufacturer)*. Each party shall use at least the same degree of care in safeguarding the other party's Confidential Information as it uses in safeguarding its own confidential information.

X-3 (emphasis added).

Under the Distribution Agreement, SNC agreed that it would not "use or disclose such Confidential Information to any person or entity, except to its own employees having a 'need to know.'"  SNC further agreed that it would not "attempt to decompile, disassemble or reverse engineer Manufacturer's Products." *Id.*; *see also* Tex. Civ. Prac. Rem. Code § 134A.002(2) (defining "improper means").   As discussed above, SNC breached its obligations, misappropriated Mobius's trade secrets, and released its ImagePro knock-off.

      3.    <u>SNC Improperly Used Mobius's Trade Secrets</u>

SNC's improper and unauthorized use of Mobius's trade secrets is beyond dispute.  First, there can be no dispute that SNC "used" Mobius's trade secrets.  As Judge Ellison explained in *Wellogix*, "'use' of a trade secret means commercial use, by which a person seeks to profit from the use of the secret." *Wellogix*, 823 F. Supp. 2d at 566.  Here, SNC clearly sought to profit from Mobius's know-how and years-long development of DoseLab.

Second, SNC's use of Mobius's protected technology was unauthorized. Dr. Childress repeatedly admonished SNC employees, including its CEO, that DoseLab is to be used "only by salespeople for the purposes of selling DoseLab" and that "DoseLab is not to be used as a demo

product for your software teams, nor is it to be used as a tool to guide development of any Sun

Nuclear Products."  X-1 ¶¶16–17.

> 4.   Mobius Has Been Harmed by SNC's Misappropriation

"When a defendant possesses trade secrets and is in a position to use them, harm to the

trade secret owner may be presumed."  *IAC, Ltd.*, 160 S.W.3d at 200.  Not only is SNC in a

position to use Mobius's trade secrets, SNC has used and is using those trade secrets to poach

current and potential DoseLab licensees from Mobius.  SNC's campaign of misrepresentation

and misinformation has tarnished DoseLab's reputation. Further, SNC's wrongful conduct has

deprived Mobius of DoseLab sales and opportunities, tarnished the goodwill DoseLab has

fostered among its licensees, and diminished the value of Mobius's intellectual property.

In sum, Mobius can and will succeed on the merits of its trade secret misappropriation

claim.

**B.**   Mobius Faces Irreparable Harm

To satisfy this prong of the preliminary injunction test, Mobius "must show that it is

likely to suffer irreparable harm, that is, harm for which there is no adequate remedy at law."

*Daniels Health*, 710 F.3d at 585.  In *Heil Trailer*, the Fifth Circuit explained that state law

governs whether certain injuries are properly qualified as irreparable:

> An irreparable injury is one that cannot be undone by monetary damages or one
> for which monetary damages would be especially difficult to calculate. Because
> both the availability and the measure of damages are governed by state law in a
> diversity case, it follows that state law also governs whether certain injuries
> qualify as irreparable for the purposes of granting a preliminary injunction.
> Accordingly, this court has looked to Texas law to determine whether potential
> injury would be irreparable where the plaintiff sought a preliminary injunction to
> prevent the use of trade secrets by a competitor.

2013 WL 5630969, at *4 (internal endnotes omitted).

Texas courts have frequently found that irreparable harm is likely in cases where trade secrets have been misappropriated. In *IAC, Ltd. v. Bell Helicopter Textron*, the Fort Worth Court of Appeals noted that "when a defendant possesses trade secrets and is in a position to use them, harm to the trade secret owner may be presumed."   160 S.W.3d at 200.   "The threatened disclosure of trade secrets constitutes irreparable injury ***as a matter of law***."   *Id.* (emphasis added).  SNC possesses Mobius's trade secrets and has been using them.  Not only should harm be presumed, but SNC's continued flouting of its contractual obligations to maintain confidentiality constitutes irreparable injury as a matter of law.

Texas courts—both state and federal—repeatedly have found irreparable harm and inadequate remedy at law when a plaintiff asserts incalculable injury to its goodwill and competitive reputation. In *Intercontinental Terminals Co., LLC v. Vopak N. Am., Inc.*, 354 S.W.3d 887, 895-96 (Tex. App.—Houston [1st Dist.] 2011, no pet.), for example, the Houston Court of Appeals affirmed the trial court's conclusion that the threatened loss of the plaintiff's reputation and goodwill would be "very difficult to calculate" and explained:

> Threatened injury to a business's reputation and goodwill with customers is frequently the basis for temporary injunctive relief.  While such injuries are not categorically irreparable, the irreparable injury requirement is satisfied when injuries of this nature are difficult to calculate or monetize.

Similarly, in *Frequent Flyer Depot, Inc. v. American Airlines, Inc*., 281 S.W.3d 215, 228 (Tex. App.—Fort Worth 2009, pet. denied), the Fort Worth Court of Appeals affirmed the trial court's conclusion that the airline had presented evidence of irreparable harm to its business:

> Disruption to a business can be irreparable harm.  Moreover, assigning a dollar amount to such intangibles as a company's loss of clientele, goodwill, marketing techniques, and office stability, among others, is not easy.

*See also Sharma*, 231 S.W.3d at 427 ("The potential damage caused by the loss of Vinmar's isoprene and caprolactum business, even if not complete, cannot be easily calculated and

therefore a legal remedy is inadequate."); *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 24 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd) (affirming temporary injunction based on testimony that lost goodwill would be "immeasurable"); *Am. Express Fin. Advisors, Inc. v. Scott*, 955 F. Supp. 688, 693 (N.D. Tex. 1996) ("In a situation where trade secrets and goodwill are involved, the threat is significant that the harm experienced by the misappropriation or misuse of trade secrets will be irreparable."). In fact, in *Heil Trailer*, the Fifth Circuit admonished the district court for *failing* to consider "the considerable authority under Texas law indicating that *injuries to goodwill and competitive position are irreparable where trade secrets have been misappropriated*." 2013 WL 5630969, at *4 (emphasis added).

In this case, Mobius has suffered and continues to suffer disruption to its business, risks loss of current and future customers, and risks loss of goodwill and loss of reputation because of SNC's willful misappropriation.  SNC's misconduct has resulted in licensees not receiving their orders in a timely fashion (X-1 ¶¶31, 38), has caused licensees to question whether Mobius will support DoseLab (*Id*. ¶35), and creates a risk that current and potential DoseLab licensees will abandon DoseLab and Mobius altogether (*Id*. ¶¶34–36).  Not only are current and future DoseLab's sales and revenue in jeopardy, but SNC's inappropriate and tortious conduct could foreclose sales opportunities for other Mobius products.  These losses to Mobius's business cannot be easily calculated, if at all, which makes a legal remedy inadequate under Texas law.

## C.    The Balance of Hardships Favors Mobius

In this case, the threatened harm to Mobius absent an injunction heavily outweighs the potential harm to SNC if enjoined.  Mobius sells DoseLab and two other products.  That's it.  In 2012, DoseLab accounted for **96%** of Mobius's income, and has contributed **79%** of Mobius's income so far in 2013.  X-1 ¶42.  This includes revenue from new licenses as well as revenue

from maintenance renewal packages, which can be recognized for several years after the initial license.  *Id.*  Needless to say, DoseLab is critical to Mobius's existence.

By contrast, SNC sells dozens of other products and has been selling ImagePro for mere weeks.  While it is possible that SNC would suffer harm by not being able to sell ImagePro, (1) that harm is the product of its own malfeasance, and (2) Mobius stands to suffer significantly greater losses based on SNC's breach of confidence and willful misappropriation.  *See, e.g., Am. Express*, 955 F. Supp. at 693 (finding restriction on defendant's activities outweighed by "harm to Plaintiff in terms of lost customer goodwill and business").  Accordingly the balance of hardships strongly favors Mobius.

D.     Enjoining SNC Would Have No Adverse Effect on the Public Interest

There is no reason to believe that enjoining SNC would have an adverse effect on the public interest. First, Mobius does not seek to enjoin SNC from supporting the treatment centers and clinics at which ImagePro is currently installed—even though this relief could fall within the scope of a reasonable request for a preliminary injunction.

Second, there is no evidence that any treatment center or clinic would no longer be able to treat patients or otherwise be detrimentally affected if *SNC* could no longer promote, market, or sell ImagePro. These treatment centers and clinics would be able to maintain their existing DoseLab functionality or turn to other QA software providers, if necessary.  Thus, treatment centers and clinics (and the public interest associated with their operation) will remain unaffected if SNC is enjoined.

IV.
Conclusion

Because Mobius has shown a substantial likelihood of success on the merits of its trade secret misappropriation claim, irreparable harm, a balance of hardships in its favor, and no

adverse effect on the public interest, the Court should grant its request for a preliminary injunction.   The Court should enjoin SNC from:

(1) "promoting, marketing, advertising, selling, and offering for sale SNC's ImagePro software product or software modules therein" and

(2) "promoting, marketing, selling, and offering for sale any software products or modules derived through SNC's misappropriation of Mobius's trade secrets, regardless of whether these software products or modules are stand-alone products or incorporated into other products."

A proposed order is attached.


Dated: November 7, 2013

Respectfully submitted,

SUSMAN GODFREY L.L.P.

*/s/ Chanler A. Langham*
Chanler A. Langham (Attorney-in-Charge)
State Bar No. 24053314
S.D. Adm. 659756
John P. Lahad
State Bar No. 24068095
S.D. Adm. 1114929
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone:  (713) 651-9366
Fax:  (713) 654-6666

*Attorneys for Plaintiff*
*Mobius Medical Systems, LP*

<u>Certificate of Conference</u>

I certify that on November 4, 2013, Counsel for Mobius (Langham) met and conferred via telephone with Counsel for SNC (Broyles), who indicated that SNC was opposed to relief requested in this Motion.

*/s/ Chanler A. Langham*
Chanler A. Langham

<u>Certificate of Service</u>

I certify that on November 7, 2013, this document properly was served on counsel of record via electronic filing in accordance with the USDC, Southern District of Texas Procedures for Electronic Filing and Local Rule 5.

*/s/ Chanler A. Langham*
Chanler A. Langham
